Filed 10/25/22

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SIX

| | |
|---|---|
| RAUL B. FIGUEROA,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FCA US, LLC,<br><br>    Defendant and Appellant. | 2d Civ. No. B306275<br>(Super. Ct. No. 56-2018-00507038-CU-BC-VTA)<br>(Ventura County) |

A jury finds defendant manufacturer to be in willful violation of the Song-Beverly Consumer Warranty Act (Song-Beverly Act) (Civ. Code,[1] § 1790, et seq.), when it refused to repurchase or replace a defective truck. Plaintiff was forced to sell the truck and received a little more than $3,000 than he owed on the loan to purchase the truck.

The jury awarded the truck owner $30,154 in damages. The manufacturer contends it is entitled to a credit for the $3,000 plaintiff received on the loan. We disagree with the manufacturer and *Niedermeier v. FCA US LLC* (2020) 56

---

[1] All further statutory references are to the Civil Code unless otherwise indicated.

Cal.App.5th 1052, review granted February 10, 2021, S266034 (*Niedermeier*), which holds otherwise.  We affirm.

FACTS

In January 2014, Raul B. Figueroa purchased a new Dodge Ram pickup truck for $33,824.88.  FCA US LLC (FCA) is the manufacturer of the truck.  Within 900 miles the truck engine overheated and the truck had to be towed to the dealership for repair.  The dealership replaced a defective radiator hose clamp, and visually inspected the cylinder heads for cracks that are often caused by overheating.  The dealership did not undertake a standard dye test for leaks.  The engine continued to overheat and after a few thousand miles the water pump failed.  The dealership replaced the water pump under warranty.

Figueroa took his truck back to the dealership another six to eight times complaining of overheating.  Each time the service representative took the truck away for about 30 minutes before telling him it was fine.

In desperation, Figueroa took his truck to a different dealership.  That dealership told him the thermostat housing was leaking.  The dealership refused to repair it under warranty, however, because it was an after-market thermostat housing.  Figueroa did not install the after-market thermostat housing.  He took it back to the original dealership who installed a new thermostat housing but charged him $199.  The engine still overheated.

Fed-up with his unreliable truck, Figueroa asked the dealership to buy it back.  But the dealership offered only $10,000 as a trade-in because of its poor condition.  Figueroa refused.  He owed more on the truck than $10,000.

Finally, Figueroa asked his nephew to call FCA and ask it to replace the truck.  Figueroa was present when his nephew made the call.  FCA refused to repurchase the truck or even assess whether it was a lemon.

Figueroa sold the truck to CarMax for $17,000.  He was tired of taking the truck in for repairs and did not feel safe driving his family in it.  FCA never offered to repurchase the truck before Figueroa filed suit.

*Procedure*

Figueroa filed a complaint against FCA alleging causes of action for breach of express warranty and breach of implied warranty.

FCA made an offer of settlement pursuant to Code of Civil Procedure Section 998 of $30,000.  Figueroa refused the offer, and the matter went to jury trial.

The jury found FCA breached its express warranty and awarded $20,154 in compensatory damages plus a $10,000 civil penalty, for a total of $30,154.  The jury also found FCA breached its implied warranty and awarded $30,154 in compensatory damages.  The trial court awarded Figueroa $143,046.50 in attorney fees.

DISCUSSION

I.

*FCA not entitled to net cash Figueroa received from sale*

FCA contends the judgment must be reduced because it is entitled to a credit for the net cash back Figueroa received from the sale to CarMax.

Figueroa sold the truck to CarMax for $17,000.  That is $3,191.93 more than he owed on the loan he used to purchase the truck.

Section 1793.2, subdivision (d)(2) provides in part: "If the manufacturer or its representative in this state is unable to service or repair a new motor vehicle, . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle in accordance with subparagraph (A) or promptly make restitution to the buyer in accordance with subparagraph (B)."

Subparagraph (B) of section 1793.2, subdivision (d)(2) provides: "In the case of restitution, the manufacturer shall make restitution in an amount equal to the actual price paid or payable by the buyer, including any charges for transportation and manufacturer-installed options, but excluding nonmanufacturer items installed by a dealer or the buyer, and including any collateral charges such as sales or use tax, license fees, registration fees, and other official fees, plus any incidental damages to which the buyer is entitled under Section 1794, including, but not limited to, reasonable repair, towing, and rental car costs actually incurred by the buyer."

Subparagraph (B) establishes the amount of restitution FCA must pay. (§ 1793.2, subd. (d)(2)(B).) "[T]he manufacturer shall make restitution in an amount equal to the actual price paid or payable by the buyer . . . ." (*Ibid.*) The statute is clear and unequivocal. Nowhere in section 1793.2. subdivision (d)(2)(B), or elsewhere in the Song-Beverly Act, is there a provision allowing cash back to the manufacturer. We cannot add words to a clear and unequivocal statute. (*Hudson v. Superior Court* (2017) 7 Cal.App.5th 1165, 1172.)

FCA argues the word "restitution" in section 1793.2, subdivision (d)(2) requires Figueroa to return the benefit he

4

received from the transaction, in this case, the cash he received from the truck's sale.  We might agree but for express definition of restitution in subparagraph (B) of section 1793.2, subdivision (b)(2).

Undaunted by the lack of statutory authority, FCA argues that public policy requires that it can be credited with the cash Figueroa received from the sale.  FCA's position is that having sold Figueroa a defective vehicle and having willfully violated the Song-Beverly Act by refusing to promptly replace or repurchase the vehicle, it is entitled to be benefitted with the cash Figueroa received.  FCA complains that Figueroa received a windfall at FCA's expense.  What FCA refuses to acknowledge is that any such windfall is the direct result of FCA's willful violation of the Song-Beverly Act.  Had FCA fulfilled its duty under the Act to promptly replace or repurchase the truck, there would be no such windfall.  We are aware of no public policy that requires FCA be compensated for its own willful violation of the law.

FCA argues that if the owner of a defective vehicle is encouraged by a windfall to sell a defective vehicle on the open market, the purchaser of the vehicle will not receive the protections afforded by the Song-Beverly Act.  Under the act, where a manufacturer has reacquired a defective vehicle, before it can be resold, the manufacturer must repair the defect (§ 1793.22, subd. (f)(1)); the vehicle must be retitled in the name of the manufacturer, the title must be inscribed with the notation "Lemon Law Buyback," and a decal must be affixed to the vehicle with the same notation (§ 1793.23, subd. (c), Veh. Code § 11713.12, subd. (a)); the prospective buyer must be given notice that the vehicle is a lemon law buyback (§ 1793.23,

subd. (f)); and the buyer must be given a one year manufacturer warranty that the vehicle is free from the defect (§ 1793.22 (f)(1)).  FCA's concern for those who purchase defective vehicles on the open market without the protections afforded by the Song-Beverly Act is admirable.  But when confronted with the duty to reacquire Figueroa's defective vehicle and provide such protections to a subsequent purchaser, it refused to do so.

FCA's reliance on *Niedermeier* is misplaced.  There, plaintiff purchased a new vehicle manufactured by FCA. Plaintiff experienced numerous problems with the vehicle and brought it in for repair multiple times.  Plaintiff asked FCA to buy the vehicle back.  FCA refused, Plaintiff traded the vehicle in for a new car, and received $19,000 off the purchase price. Plaintiff sued FCA under the Song-Beverly Act and recovered damages.  The trial court denied FCA a set-off of $19,000 to reflect the trade-in value of plaintiff's vehicle.  The Court of Appeal reversed.

In reversing, the court acknowledged "that section 1793.2, subdivision (d)(2)(B) sets the amount of restitution at 'the actual purchase price paid or payable.'" (*Niedermeier*, *supra*, 56 Cal.App.5th at p. 1071)  The appellate court stated that to read the statute literally would disregard the Legislature's choice of the term "restitution" and provide plaintiff with an "unjustified windfall." (*Ibid*.)  In addition, the court stated it does not consider the language of section 1793.2, subdivision (d)(2)(B) in isolation.  To permit plaintiff to receive the trade-in value of her vehicle and a full refund from FCA would undercut the requirement that the manufacturer label the vehicle as a "lemon" and notify the prospective buyer of that fact.  (*Id*. at pp. 1071-1072.)

We disagree with *Niedermeier*. First, the Legislature used the term "restitution," but it defines what it means by restitution in section 1793.2, subdivision (d)(2)(B). The definition does not include a set-off for the cash received by the vehicle owner on sale of the vehicle or the vehicle's trade-in value. Second, FCA cannot complain that the vehicle's owner has received an unjustified windfall when it could have avoided such a result by complying with the Song-Beverly Act. Third, it is FCA, and not the vehicle's owner, who undercuts the act's labeling and notification requirements by refusing to repurchase the vehicle as required by the act. The labeling and notification requirements only apply where the manufacturer replaces or repurchases the vehicle, something FCA has refused to do.

As this case and *Niedermeier* show, FCA operates in open defiance of the Song-Beverly Act. It considers promptly repurchasing, repairing, labeling as a lemon and selling the vehicle at a deep discount with a one-year warranty, a losing proposition. It would much rather force the owner of a defective vehicle to sell it on the open market, or trade it in without a label or warning, and use the cash back on trade-value as an offset. *Niedermeier* encourages FCA to do just that. We decline to follow *Niedermeier*, although in some cases the owner of a vehicle receives a windfall. FCA could have avoided this by complying with the law.

## II.
### *Registration renewal fees and insurance*

FCA contends the judgment must be reduced to the extent it contains registration renewal fees and insurance premiums.

FCA argues that the judgment includes an award for two years of registration renewal fees in the amount of $600, and

7

$3,420 for 36 months of car insurance premiums.  FCA claims there is no evidence Figueroa paid registration renewal fees or insurance premiums.

But FCA fails to show that any of the damages the jury awarded included registration renewal fees or insurance premiums.  The jury simply awarded a lump sum of damages.  With such an undifferentiated award, there is no way to determine what portion, if any, of the verdict was rewarded on an improper basis.  (*Heiner v. Kmart Corporation* (2000) 84 Cal.App.4th 335, 346.)  FCA's failure to seek a jury verdict form segregating the elements of damages foreclosed any challenge to a portion of the damages as improperly awarded.  (*English v. Lin* (1994) 26 Cal.App.4th 1358, 1369.)

## III.

### *Willful violation*

FCA contends there is no substantial evidence to support the jury's finding of willful violation of the Song-Beverly Act.

In viewing the evidence, we look only to the evidence supporting the prevailing party.  (*GHK Associates v. Mayer Group, Inc.* (1990) Cal.App.3d 856, 872.)  We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact.  (*Ibid.*)  Where the trial court or jury has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable.  (*McIntyre v. Doe & Roe* (1954) 125 Cal.App.2d 285, 287.)

Figueroa reported overheating to FCA's dealer six to eight times.  If FCA has a policy that does not require its dealer to report such repeated complaints, it is not Figueroa's fault.  FCA cannot turn a blind eye to a problem and claim innocence.  In

8

addition, Figueroa had his nephew call FCA directly. FCA refused to repurchase the truck or even investigate whether it was a lemon. That is more than sufficient to show a willful violation.

DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondent.

CERTIFIED FOR PUBLICATION.

GILBERT, P. J.

We concur:

YEGAN, J.

PERREN, J.*

---

* Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

9

Henry J. Walsh, Judge

Superior Court County of Ventura

_____

Horvitz & Levy, Lisa Perrochet, John A. Taylor, Joshua C. McDaniel; Hawkins Parnell & Young and Ryan K. Marden for Defendant and Appellant.

Knight Law Group, Steve Mikhov, Roger Kirnos; Century Law Group, Edward O. Lear, Rizza Gonzales; Greines, Martin Stein & Richland, Cynthia E. Tobisman and Joseph V. Bui for Plaintiff and Respondent.